MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone:   (520) 624-8886
Fax:      (520) 798-1037
Email: jbarker@mcrazlaw.com
        dhindman@mcrazlaw.com

By:    J. Emery Barker, #1151
       David J. Hindman, #24704
       23042-1/

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| CURIS RESOURCES LTD., | No.  MC 12-00079-PHX-DGC |
| Plaintiff, | **RESPONSE IN OPPOSITION TO DEFENDANT DOE'S *MOTION TO QUASH SUBPOENA PURSUANT TO FED.R.CIV.P.  45(c)(3) AND ALTERNATIVE MOTION FOR PROTECTIVE ORDER –AND– MOTION FOR SANCTIONS*** |
| vs | |
| JANE DOE AND JOHN DOE, a.k.a. "erinG" etc. | |
| Defendants. | |

Plaintiff Curis Resources Ltd., ("Curis" or "Plaintiff"), by and through undersigned counsel, hereby opposes the *Motion to Quash Subpoena Pursuant to Fed.R.Civ.P.  45(c)(3) and Alternative Motion for Protective Order –and– Motion for Sanctions* (the "Motion") filed by Defendants Jane Doe and John Doe a.k.a "erinG" ("Defendant" or "Doe").

Rule 45(c)(3) does not provide a basis for quashing or modifying the subpoenas at issue. The subpoenas merely seek third-party business records that may reflect Doe's identity, which information is not privileged and will not cause an undue hardship.

1    Furthermore, Doe did not comply with the procedural requirements to warrant a protective

2    order under Rule 26(c)(1), and in any case an implied restriction protecting confidentiality is

3    already in place pursuant to the rules of court in the underlying British Columbia

4    Proceeding.

5         This Response in Opposition is further supported by the accompanying

6    Memorandum of Points and Authorities and all other pleadings filed in this case.

7         DATED: October 19, 2012.

8                                              MESCH, CLARK & ROTHSCHILD, P.C.

9

10   By _____
                                         J. Emery Barker
11                                       David J. Hindman
                                         Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Factual Background

This matter came before this Court under 28 U.S.C. §1782 for judicial assistance in conducting discovery related to a proceeding pending before the Supreme Court of British Columbia, Canada (the "British Columbia Proceeding"). The British Columbia Proceeding is an action for defamation, injurious falsehood, and false and misleading misrepresentations based on false and defamatory statements made and published by Doe. The statements at issue were published by Doe on an internet forum that is based in British Columbia, Canada, which forum is dedicated to discussing Curis, a Canadian company, and Curis' stock listing on the Toronto Stock Exchange. Because Doe published his false and defamatory statements under the pseudonym "erinG", Curis could not know Doe's true identity when it initiated the British Columbia Proceeding.

On August 9, 2012, Plaintiffs counsel, pursuant to Rule 45(a)(3), issued subpoenas to Qwest Communications Company, LLC a/k/a Century Link  ("Qwest") and to Pinal County, specifically seeking each company's records regarding IP addresses registered to each entity and used to make the false and defamatory statements about Curis which form the basis for the British Columbia Proceeding.

On August 14, 2012, Qwest responded to the subpoena with copies of the requested records. Pinal County had not responded to the subpoena at the time Doe's Motion was filed.

At the time the subpoenas were issued, the identity of Doe was unknown, and Doe's counsel had not yet made an appearance in this matter or in the British Columbia Proceeding. As a result, copies of the subpoenas were not initially served on Doe. When the undersigned became aware on September 7, 2012, that Doe had not received copies of the issued subpoenas despite subsequently filing a notice of appearance with this Court, copies of the subpoenas and Qwest's response were immediately provided to Doe's counsel.

3

1    Doe filed its Motion on September 7, 2012, without first discussing its objections to

2  the subpoenas with Curis or seeking to resolve such objections.

3  **II.    Defendant's Rule 45(c)(3) Motion to Quash is Improper**

4    In its Motion, Doe asserts that the subpoenas should be quashed or modified under

5  Rule 45(c)(3) because they require disclosure of privileged or other protected matter and

6  additionally impose an undue burden. *See Motion, p. 2-3*. Generally, only those parties

7  subject to the subpoena can bring a motion to quash under Rule 45(c)(3). *In re Rhodes*

8  *Companies, LLC,* 475 B.R. 733, 740-741 (D.Nev. 2012). The subpoenas at issue are not

9  directed at Doe, and Doe has failed to identify how the business records sought from non-

10  parties are privileged, or how the subpoenas create an undue burden. In fact, the two non-

11  parties to whom the subpoenas are directed – Qwest and Pinal County – have not objected to

12  the subpoenas, and Qwest promptly responded to the subpoena by immediately producing

13  the requested business records.

14    Rule 45(c)(3) provides specific grounds upon which a Court may quash or modify a

15  subpoena. A court must quash or modify a subpoena if it fails to allow reasonable time to

16  comply; requires a non-party to travel more than 100 miles; requires disclosure of privileged

17  materials; or subjects a person to undue burden. *Rule 45(c)(3)(A)*. It is within a court's

18  discretion to quash or modify a subpoena if it requires disclosure of trade secrets; disclosure

19  of certain expert opinions, or requires a non-party to incur substantial expense to travel more

20  than 100 miles to attend trial. *Rule 45(c)(3)(B)*. Doe has not shown that any of these grounds

21  are present here.

22    By its terms, Rule 45(c)(3) does not provide authority for a court to modify or quash

23  a subpoena to prevent identifying a John Doe or Jane Doe defendant. *See Patrick Collins,*

24  *Inc. v. John Does 34-51*, 2012 WL 871269 (S.D.Cal. 2012) (denying John Doe defendant's

25  motion to quash subpoena seeking user information and directed at non-party internet

26  service provider); *Malibu Media, LLC v. Does 1-25*, 2012 WL 2367555, *2 (S.D.Cal. 2012)

1    (denying John Doe defendant's motion to quash subpoena seeking user information and

2    directed at non-party internet service provider). A "John Doe" defendant's privacy interest

3    in their identity and contact information "is minimal at best." *Malibu Media, LLC v. Does 1-*

4    *25*, 2012 WL 2367555, *2 (S.D.Cal. 2012). Doe has not provided any evidence of any

5    personal right or interest in the subpoenaed records of Qwest or Pinal County.

6         Doe's argument to quash is essentially a motion to dismiss the Complaint pending in

7    the British Columbia Proceeding. *See Motion, pps.3-9*. However, "[b]y its terms, Rule 45

8    does not provide authority for a court to quash a subpoena based on an alleged defect in the

9    complaint." *Malibu Media, LLC v. Does 1-25*, 2012 WL 2367555, *2 (S.D.Cal. 2012).

10   While Defendant may wish to raise such arguments in the British Columbia Proceeding,

11   they are not proper grounds under Rule 45(c)(3) to quash or modify a subpoena.

12        Doe argues at length that his identity should be protected because the statements

13   made are protected as free speech under the First Amendment to the United States

14   Constitution. *See Motion, p. 3-6*. However, false statements of fact are not protected by the

15   First Amendment. *See e.g. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51 (1988). As the

16   Complaint in the British Columbia Proceeding alleges, Doe knowingly made false

17   statements of fact concerning Curis, including falsely stating that Curis had its permits

18   rejected by the Arizona Department of Environmental Quality and that Curis had not

19   disclosed the rejection to its investors. *See Curis' Notice of Civil Claim, attached to Doe's*

20   *Motion as Exhibit A*. Accordingly, any First Amendment considerations are not applicable

21   to the claims against Doe.

22        Doe also asks this Court to quash the subpoenas because the British Columbia Court

23   will not have jurisdiction over Doe, stating "Doe has never even been to Canada". *See*

24   *Motion, p. 9*. However, "lack of personal jurisdiction is not a proper basis to quash a

25   subpoena, where, as here, the John Doe defendants have not yet been named." *Malibu*

26   *Media, LLC v. Does 1-25*, 2012 WL 2367555, *2-3 (S.D.Cal. 2012). Curis believes there is

1  personal jurisdiction over Doe in British Columbia based on Doe's actions of publishing the

2  false and defamatory statements on the Canadian internet forum directed at Curis.

3  Nonetheless, through discovery relating to Doe's identity, additional contacts with the

4  British Columbia forum may become apparent. Accordingly, Doe's arguments regarding

5  jurisdiction are premature, if not misleading.

6  **III.   Defendant's Request for a Protective Order is Misplaced**

7         In the alternative, the Defendant has requested that this Court enter a protective order

8  to "protect Defendant from undue hardship, annoyance, embarrassment, and oppression" by

9  "prohibiting any party from publicly disclosing any information relating to Doe that Plaintiff

10  obtains via the subpoena, including requiring any pleadings filed in this action that contain

11  Defendant's confidential information to be redacted and filed under seal to prevent public

12  disclosure." Defendant's request is misplaced and improper for multiple reasons.

13         Prior to filing its Motion, Doe failed to "confer or attempt to meet and confer" as

14  required by Rule 26(c)(1). Doe's counsel falsely certifies in the Motion that he "attempted

15  to confer in good faith with Plaintiff's counsel" concerning the subpoenas and that

16  "Plaintiff's counsel indicated verbally that it would not consent or otherwise stipulate to the

17  relief and it would indeed oppose Defendant's Motion." In fact, Defendant's counsel ***never***

18  ***contacted the undersigned*** about resolving any dispute concerning the subpoenas. In fact,

19  the very first conversation between the undersigned and Doe's counsel was when the

20  undersigned called Doe's counsel on September 19, 2012 – nearly two weeks after the

21  Motion was filed. This false certification, and the fact that Doe did not attempt to meet and

22  confer prior to filing the Motion, nor even after it was filed, should result in Doe's Motion

23  and request for a protective order be denied summarily pursuant to Rule 26(c)(1).

24         Furthermore, this matter is only before this Court to "assist in obtaining evidence for

25  litigation pending in the Supreme Court of British Columbia, Canada." (*See Order, entered*

26  *8/28/12 at Dkt. #6*). The only action pending between the parties is the British Columbia

1   Proceeding.  In fact, Doe's request for a protective order is entirely superfluous in light of

2   all discovery being subject to a de facto confidentiality restriction under British Columbia

3   law. As explained by the Court of Appeal for British Columbia in *International*

4   *Brotherhood of Electrical Workers, Local 213 v. Hochstein*, 2009 BCCA 355, ¶7, "[t]he

5   implied, or court-imposed, undertaking of confidentiality precludes a party who has

6   obtained documents on discovery, from using them otherwise than for purposes of the

7   litigation in which they were obtained. The undertaking has been a settled aspect of the law

8   of this province since this court's decision in Hunt v. T&N plc (1995) 4 B.C.L.R. (3d)

9   110."[1] This implied undertaking of confidentiality sufficiently protects any concern by Doe

10  and makes any proposed protective order duplicative and unnecessary.

11          This Court should defer to the Supreme Court of British Columbia as to what

12  additional limits, if any, should be placed on Curis' use of any information received through

13  discovery. Defendant can renew its Motion before the Supreme Court of British Columbia,

14  which court is able to weigh any use of information produced by Qwest and Pinal County

15  against Defendant's alleged concerns over public dissemination.

16  **IV.    Sanctions are Not Warranted**

17          Contrary to Doe's assertions in his Motion, Doe's counsel had not made an

18  appearance at the time the subpoenas were issued, and Doe's counsel ***never*** attempted to

19  "confer in good faith" prior to filing the Motion. In fact, although Doe's counsel certifies

20  that he "attempted to confer in good faith with Plaintiff's counsel concerning the relief

21  Defendant seeks herein" and that "Plaintiff's counsel indicated verbally that it would not

22  consent or otherwise stipulate to the relief and it would indeed oppose Defendant's Motion",

23  such certification is completely false.

24

25

26  [1] A copy of the Court of Appeal for British Columbia's decision in *International Brotherhood of Electrical Workers, Local 213 v. Hochstein* is attached hereto as Exhibit A.

1       The first conversation between the undersigned and Doe's counsel was when the

2 undersigned called Doe's counsel on September 19, 2012. In fact, other than the Motion

3 itself, Doe has never requested that the subpoenas be withdrawn or modified, or attempted

4 to discuss the issue with undersigned counsel to see if Doe's objections could be resolved

5 short of involving the Court. Furthermore, as detailed above, Doe's argument for quashing

6 or modifying the subpoenas, and for issuing a protective order, are without merit.

7 Accordingly, Doe's request for sanctions should be denied.

8 **V.   Conclusion**

9       Defendant Doe has not presented a permissible basis for this Court to quash or

10 modify the subpoenas directed to non-parties Qwest and Pinal County pursuant to Rule

11 45(c)(3), or for the entry of a protective order pursuant to Rule 26(c)(1). There has been no

12 showing of any undue hardship or protectable interest in these third-parties' business

13 records. The Court should defer to the Supreme Court of British Columbia, where the

14 British Columbia Proceeding is pending, with respect to Curis' complaint filed against Doe

15 and how any information obtained through discovery, including from Qwest and Pinal

16 County, may be used in relation to the British Columbia Proceeding. Accordingly, Doe's

17 Motion should be denied.

18       DATED: October 19, 2012.

19                              MESCH, CLARK & ROTHSCHILD, P.C.

20

21                           By_____

                                J. Emery Barker

22                                 David J. Hindman

                                Attorneys for Plaintiff

23

24

25

26

1

2

Copy mailed and emailed the above date to:

3

Daniel R. Warner
Kelly / Warner, PLLC
404 S. Mill Ave. Suite C-201

4

Tempe, Arizona 85281

5

dan@kellywarnerlaw.com

6

Attorneys for Defendant John Doe and Jane Doe a/k/a "erinG"

7

8

By _____

9

356584

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT A

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:     *International Brotherhood of Electrical*
              *Workers, Local 213 v. Hochstein,*
              2009 BCCA 355

Date: 20090813
Docket: CA036365

Between:

### International Brotherhood of Electrical Workers, Local 213

Respondent
(Plaintiff)

And

### Philip Hochstein and
### Independent Contractors and Businesses Association of British Columbia

Appellants
(Defendants)

Before:     The Honourable Madam Justice Newbury
            The Honourable Mr. Justice Low
            The Honourable Mr. Justice K. Smith

On appeal from the Supreme Court of British Columbia, Vancouver Registry, Docket S025937, pronounced August 1, 2008, 2008 BCSC 1009.

Counsel for the Appellant:                     R.W. Grant

Counsel for the Respondent:                    L.B. McGrady, Q.C.
                                               G.J. Baugh

Place and Date of Hearing:                     Vancouver, British Columbia
                                               May 26, 2009

Place and Date of Judgment:                    Vancouver, British Columbia
                                               August 13, 2009

**Written Reasons by**:
The Honourable Madam Justice Newbury

**Concurred in by:**
The Honourable Mr. Justice Low
The Honourable Mr. Justice K. Smith

**Reasons for Judgment of the Honourable Madam Justice Newbury:**

[1]     By writ and statement of claim filed in November 2002, the plaintiff, Local 213 of the International Brotherhood of Electrical Workers (the "Union") sued four defendants, including the appellants Mr. Hochstein

and the Independent Contractors and Business Association of British Columbia, for defamation.  The Union objected to certain articles published in the local newspaper concerning its so-called "job targeting" or "market recovery" program, an attempt by the Union to compete more effectively by subsidizing some labour costs of unionized contractors, using funds received as "union dues".  The Union asserted that the publication falsely implied the program was an illegal tax evasion scheme that defrauded the federal and provincial governments of tax revenue.

[2]     Prior to trial, various court orders were made regarding the production of documents by the Union regarding the market recovery program.  One of those orders was appealed: see 2004 BCSC 310 and 2005 BCCA 44.  Later, in response to further submissions made on behalf of the Union regarding the confidentiality of the documents it was required to disclose, the Court of Appeal reminded counsel by memo that "there is a strict rule enunciated in a case from this Court, *Hunt v. T & N plc* (1995), 34 C.P.C. (3d) 133, concerning the duty imposed on counsel and parties to litigation to preserve confidentiality of material produced in the litigation process.  We would expect this law to be sedulously followed."  When providing documents to the defendants thereafter, the Union reminded counsel for the defendants that it "insisted upon strict compliance" with the undertaking of confidentiality and that it would "pursue all available remedies" if there was any breach of the undertaking.  A written agreement between counsel concerning documents made no mention of the undertaking.

[3]     The trial began in December 2006 and ended in March 2007.  As part of its case, the Union introduced into evidence the following documents, as described by the chambers judge at para. 7 of his reasons:

> (a)     Spreadsheets (Numbers 10 and 11 from Exhibit 3) which identify contractors who applied for and received funding from the plaintiff's market recovery program, the amount of funding the contractors were to receive from the market recovery fund, the total hours funded and the rate at which those hours were to be funded.  The information contained in the spreadsheets was obtained from confidential letters of commitment prepared by the plaintiff's officers and employees, and delivered to the contractors in respect of the electrical portion of work to be performed on particular construction projects.  All communications between the plaintiff and the union contractors relating to the market recovery program were made on a confidential basis.
>
> (b)     The plaintiff's annual financial statements from 1992 to 2002, which contained the amounts held in the market recovery fund and the annual expenditures made from the market recovery fund.
>
> (c)     Excerpts from the plaintiff's newsletters to its members.

The chambers judge noted that no mention was made of the implied undertaking of confidentiality by counsel at trial.  Nor did the defendants apply to be released from their undertaking, or suggest that upon the documents being marked as exhibits at trial, the undertaking would somehow expire or cease to have effect.

[4]     Mr. Justice Groberman rendered judgment in the action on October 11, 2007.  His Lordship held that the statements complained of by the plaintiff were not capable of supporting the defamatory meanings alleged by the Union and he dismissed the action.  At the close of his reasons, he commented that it was unfortunate that the case had reached the Court and that:

> ... Discussion of issues of public policy ought to be encouraged.  The impugned statements in this case were primarily about taxation policy rather than about the plaintiff union.  It is unseemly for the

plaintiff to attempt to squelch such discussion through resort to a defamation action, even if the defendants have been careless in their statement of facts. Debates as to the correctness or falsity of the defendants' assertions were properly a matter for public discourse. [At para. 37.]

No appeal was taken from the dismissal of the action.

[5]    A few weeks later, the defendants advised counsel for the Union of their wish to "publicize" information contained in exhibits that had been filed at trial. Mr. Grant on behalf of the defendants invited Mr. McGrady to advise if he believed there was any basis in law for objecting to the proposed use of the material, so that the defendants could apply to the Court for directions. The Union did object, and in due course, the defendants applied in this action for a declaration that the exhibits described above (referred to as the "Documents") had not been sealed and that public use of the Documents had not been restricted, and for an order releasing the defendants from any undertakings restricting disclosure of the Documents.

[6]    The motion was not heard until May 20, 2008 – by which time the Supreme Court registry had notified the Union that the exhibits filed at trial would be destroyed at the end of the one-year statutory retention period if they were not claimed. Counsel for the Union picked up the Documents promptly upon receiving this notice.

*The Implied Undertaking*

[7]    The implied, or court-imposed, undertaking of confidentiality precludes a party who has obtained documents on discovery, from using them otherwise than for purposes of the litigation in which they were obtained. The undertaking has been a settled aspect of the law of this province since this court's decision in *Hunt v. T & N plc* (1995) 4 B.C.L.R. (3d) 110. *Hunt* has been followed in other provinces, including Ontario (see *Goodman v. Rossi* (1995) 125 D.L.R. (4th) 613 (Ont. C.A.)), Saskatchewan (see *Laxton Holdings Ltd. v. Madill* [1987] 3 W.W.R. 570 (Sask. C.A.)), and New Brunswick (see *Rocca Enterprises Ltd. v. University Press of New Brunswick Ltd.* (1989) 103 N.B.R. (2d) 224 (Q.B.)), and was recently cited with approval in *Juman v. Doucette* 2008 SCC 8, [2008] 1 S.C.R. 157, at para. 27. In the latter case, Binnie J. for the Court noted two primary rationales for the implied undertaking. First, he said, a proper trial discovery is "essential to prevent surprise or 'litigation by ambush', to encourage settlement once the facts are known, and to narrow issues even where settlement proves unachievable." Thus the rules of court of most jurisdictions compel litigants to answer all relevant questions posed on discovery, opening the gate to investigate what may be confidential documents in pursuit of allegations that may ultimately be found to have no merit at all. (Para. 24.) Second, Binnie J. noted:

> A litigant who has some assurance that the documents and answers will not be used for a purpose collateral or ulterior to the proceedings in which they are demanded will be encouraged to provide a more complete and candid discovery. This is of particular interest in an era where documentary production is of a magnitude ("litigation by avalanche") as often to preclude careful pre-screening by the individuals or corporations making production. See *Kyuquot Logging Ltd. v. British Columbia Forest Products Ltd.* (1986), 5 B.C.L.R. (2d) 1 (C.A.), *per* Esson J.A. dissenting, at pp. 10-11. [At para. 26.]

Both rationales, then, are aimed at ensuring full disclosure of all relevant documents is made prior to trial.

Again in the words of Binnie J. in *Doucette*, disclosure of all relevant documents is required because the public interest in "getting at the truth" in a civil action outweighs the examinee's privacy interest; but since discovery is compelled, the undertaking ensures that the invasion of privacy is generally limited to that purpose alone. (Para. 25.)

[8]     Even so, the law also recognizes that there may be exceptional circumstances in which the public interest in full disclosure may be outweighed by some more compelling public interest, as discussed in *Doucette* at paras. 30-8. At para. 34, Binnie J. suggested that the following rule of court in force in Manitoba, Ontario and Prince Edward Island reflects the common law more generally:

> If satisfied that the interest of justice outweighs any prejudice that would result to a party who disclosed evidence, the court may order that [the implied or "deemed" undertaking] does not apply to the evidence or to information obtained from it, and may impose such terms and give such directions as are just. [At para. 34.]

[9]     The law as to whether and when the implied undertaking comes to an end has been less discussed and has therefore been less clear – at least until recently. Since counsel on this appeal focussed on the state of the law on this point as at the commencement of the trial (December 2006), a brief review of the cases to which they referred us may be in order. Although the law on this point goes back much further (see the review of English and Canadian cases beginning at para. 18 of *Goodman v. Rossi, supra*), counsel took as their starting-point the decision of the House of Lords in *Home Office v. Harman* [1982] 1 All E.R. 532 (H.L.). It clearly and dramatically framed the debate concerning the use, for "extraneous" purposes, of confidential documents disclosed in pre-trial proceedings and introduced into evidence at trial. The plaintiff in the underlying action was a prisoner who was suing the Home Office in connection with his treatment in prison. The Home Office produced several documents prior to trial and warned the plaintiff's solicitor, Ms. Harman, that it did not wish them to be used for general purposes of the prisoners' rights organization to which she belonged. She replied that she was very well aware of the obligation not to use them for purposes other than the matter at hand. Over the first several days of trial, counsel for the plaintiff read out the material parts of 800 pages of the documents in court. The solicitor then proceeded to show the "bundles" of documents to a reporter, who published a newspaper article highly critical of the prison authorities. The Home Office sought relief, other than committal to prison, for contempt of court against the solicitor. The Court of Appeal upheld her conviction and certified the issue for the House of Lords as follows:

> ... whether a litigant's obligation or undertaking implied by law in respect of the use which may be made of his opponent's documents disclosed on discovery in the action is correctly defined as terminating if and when and to the extent that any such document is read out in open court in the course of proceedings in that action or is otherwise affected by such reading out. [At 310-11.]

[10]     The majority of the House of Lords dismissed the solicitor's appeal, with Lords Simon and Scarman dissenting. All three members of the majority gave separate speeches. Lord Diplock stated that the case was "not about freedom of speech, freedom of the press, openness of justice or documents coming into the public domain", but was rather about "an aspect of the law of discovery of documents in civil actions in the High Court." (At 299.) He noted, however, that the reason for the principle that civil actions must be heard in open court had been expressed by Lord Shaw of Dunfermline in *Scott v. Scott* [1913] A.C. 417 as a "spur to

exertion" that "keeps the judge himself, while trying, under trial." One "side-effect" of this principle, Lord Diplock noted, was that any document read out orally in court could be taken down in shorthand by anyone, even though it might later be ruled inadmissible. (At 303.) Lord Diplock observed ? with some regret, it appears ? the advent of "mechanical recording equipment" switched on as soon as a trial begins, although Ms. Harman, he said, had not sought to obtain a transcript of counsel's five-day opening speech in the underlying case. Allowing counsel to read 800 documents out to the court was in his Lordship's view indicative of "judicial turpitude". He emphasized the failure of the trial judge to conduct the trial efficiently as the basis for concluding that the reading of a document in open court should not affect the implied undertaking. In his words:

> ... the judge who has control of the trial of the action and whose duty, as a member of the judiciary, is owed not only to the litigants in that particular action but also to litigants in other actions that are waiting to come on has a duty to see that time is not wasted. He ought to be chary of allowing written documents which he (or a witness) can read for himself much more quickly silently to be read aloud by counsel in their entirety instead of confining counsel to oral references to the most material parts of them. The reason for the rule in *Scott v. Scott* [1913] A.C. 417 is not to encourage such judicial turpitude; as Bentham put it one of the reasons for the rule is just the contrary. I would myself add this as a reason (<u>additional to those based on the desirability of encouraging full and unreserved discovery of documents before trial that were given in the courts below) why public policy requires that the implied undertaking given by a solicitor to the court</u>, on obtaining production of discovery of documents belonging to his own client's adversary, that he will not take advantage of his possession of copies of those documents to sue them or to enable others to use them for some collateral purpose, <u>does not terminate as respects each individual document at the very moment that that document, whether admissible or not, is actually read out in court</u>. [At 306; emphasis added.]

[11]   Lord Keith discussed wider reasons of public policy in his concurring reasons. The implied obligation not to make "improper use" of discovered documents, he said, is directed not to the enforcement of the law relating to confidentiality but to the maintenance of the proper administration of justice. In his analysis:

> There is good reason to apprehend that, if the argument for the appellant were accepted, there would be substantially increased temptation to a litigant to destroy or conceal the existence of relevant documents which would fall properly within the ambit of discovery. There is also reason to apprehend the introduction into proceedings of tactical manoeuvrings on either side designed to secure that discovered documents are or are not read out in full. Both these developments would be undesirable from the point of view of the proper administration of justice. [At 309.]

Lord Roskill, also concurring, noted that the principle of open courts admitted of no doubt, but that it was amply safeguarded by hearing in open court, "without the subsequent making available of any documents read in open court for a purpose which had no immediate connection with the litigation in question." In his analysis, the notion that the undertaking terminates once a document is so read, militated against full and frank discovery. (At 326.)

[12]   Lord Scarman on the other hand, speaking for himself and Lord Simon, questioned whether it could be good law "that the litigant and his solicitor are alone excluded from the right to make that use of the documents which everyone else may now make, namely to treat them as matters of public knowledge? In our view, this is not the law. We do not think that a system of law which recognizes the right of freedom of communication in respect of matters of public knowledge can decently or rationally permit any such

exception." (At 312.) In the minority's view, the "general requirement of public justice and the right to freedom of communication" were overriding factors, and the anomaly of focussing on whether the documents had been read out in open court could be obviated by a rule under which documents would lose their confidentiality once they were exhibited as part of the public record at trial. (At 319.)

[13]    I note that following the House of Lords' decision, Ms. Harman applied to the European Commission of Human Rights to have the law in England changed. The government ultimately agreed to seek to amend the law to accord with the minority's view, and in 1987, the English rules on disclosure and inspection of documents were revised to provide that the undertaking as to confidentiality ceases to apply to a document "after it has been read to or by the Court, or referred to, in open court, unless the Court for special reasons has otherwise ordered ...". (See *Bibby Bulk Carriers Ltd. v. Cansulex Ltd. et al.* [1988] 2 All E.R. 820 (Q.B.) at 823-25.)

[14]    Turning to British Columbia, this court in *Hunt v. T & N plc, supra*, did not refer specifically to whether or when the undertaking of confidentiality terminates. In 1997, in *Discovery Enterprises Inc. v. Ebco Industries Ltd.* [1998] 5 W.W.R. 435, 42 B.C.L.R. (3d) 192 (B.C.S.C.), Chief Justice Williams raised the question of whether in a chambers application the filing of a document or disclosure in court should be a "rationale for ending an implied undertaking which came about to protect the disclosing party from these documents being used for extraneous purposes." He suggested that these and related questions should be fully considered by appropriate committees of the bench and bar rather than determined by a judge. In the absence of a rule of court, he said he would follow *Harman*. (At para. 31.)

[15]    In *Lac d'Amiante du Québec Ltée v. 2858-0702 Québec Inc.* [2001] 2 S.C.R. 743, 2001 SCC 51, the Court considered whether an implied rule of confidentiality applies to the content of examinations on discovery under the Quebec *Code of Civil Procedure*, R.S.Q., c. C-25. LeBel J. for the Court explored at length the sources of civil procedure in Quebec and the applicable provisions of the *Code*, concluding that a rule of confidentiality was justified by "changes that have occurred in the legal framework of the examination on discovery in Quebec's civil procedure and on the rules of civil law and the principles of Quebec's *Charter of Human Rights and Freedoms*, R.S.Q., c. C-12, concerning the protection of privacy." (Para. 41.) He referred to an "obligation" or "rule" (rather than an undertaking) of confidentiality that arises at the time of discovery:

> Examination on discovery is a procedure by which a file is established on a person. It allows for information and documents that are still private at that point to be obtained from a party. There is a reason for doing this. The reason arises from the commencement of the legal proceeding, in which a litigant has a right to defend himself or herself effectively, in accordance with the applicable legal rules. At the same time, both art. 37 and the other relevant provisions of the *Civil Code of Québec* and the Quebec *Charter* emphasize that the fact that a party may have a valid reason for establishing a file does not mean that the right to protection of the privacy or confidentiality of documents completely disappears. It continues to exist to the extent possible, subject to communication of the information needed for the conduct of the judicial proceeding. The examination on discovery is therefore subject to privacy principles and to an implied obligation of confidentiality. [At para. 69.]

and continued at para. 70:

> Of course, the right to confidentiality will end if the adverse party decides to actually use the
> evidence or information obtained on discovery, when that party chooses to use all or part of it in his
> or her own case. The legislative intent that information be communicated in a civil trial will then
> prevail, to ensure that the system is transparent. On the other hand, at the examination on discovery
> stage, concern for transparency is not an issue because the examination is not a sitting of the courts.
> It is therefore legitimate in that case to give greater weight to the privacy interest, by imposing the
> obligation of confidentiality on information that is disclosed. [At para. 70; emphasis added.]

He cited no authority for the proposition that the obligation terminates once documents are tendered into evidence by the party tendering them into evidence, and with the exception of paras. 56-61, his reasons were concerned principally with Quebec law (although see paras. 56-61.) As well, his reference to the termination of the obligation was *obiter*. *Obiter dicta* of the Supreme Court of Canada, however, are to be given considerable weight, if not strict obedience, by lower courts: see *R. v. Henry* 2005 SCC 76, [2005] 3 S.C.R. 609, at para. 57.

[16]    *Lac d'Amiante* was mentioned by Chief Justice Brenner sitting as a bankruptcy judge in an application brought in the Interclaim Holdings proceedings in *Re Down* 2002 BCSC 1142, 38 C.B.R. (4th) 199. Although the Chief Justice did not  read *Lac d'Amiante* as applying to documents filed in interlocutory proceedings – and therefore declined to agree that *Lac d'Amiante* had overruled the views expressed in *Discovery, supra* – he wrote that in *Lac d'Amiante,* the Court had "stated that in the common-law jurisdictions the implied undertaking as to confidentiality ends during the course of trial at such time as the documents or other information obtained on discovery [are] sought to be introduced. At that time, of course, any appropriate objections can be taken and appropriate rulings made by the trial judge." (At para. 18; my emphasis.) With respect, I am unable to find any such statement in *Lac D'Amiante* with respect to common law, as opposed to civil law, jurisdictions.

[17]    In May 2006, a few months before the trial began in the case at bar, the question arose in *Doucette (Litigation Guardian of) v. Wee Watch Day Care Systems Inc.* 2006 BCCA 262, 55 B.C.L.R. (4th) 66 whether the implied undertaking of confidentiality in a civil action could or should be varied to allow disclosure of discovery transcripts to the police, who were investigating a possible criminal offence. The civil action was being brought on behalf of a child who had allegedly suffered injury as a result of negligence on the part of a childcare worker. The childcare worker was to be examined for discovery. She sought an order restricting disclosure of the transcript and invoked the protection of the *Canada Evidence Act*, the *British Columbia Evidence Act* and the *Charter* at her discovery. A judge in chambers granted the Attorney General's motion to vary the implied undertaking of confidentiality to allow her discovery evidence to be shown to the police. This court on appeal ruled that the chambers judge's various rulings on the motions were premature and that if and when the childcare worker was charged with a criminal offence, it would be for the criminal court to decide whether "evidence obtained from the civil process can be admitted at her criminal trial." In the course of her reasons, however, Kirkpatrick J.A. for the Court noted, also in *obiter*, that "the confidentiality of the discovery process in British Columbia evaporates once the evidence is tendered in court. The principle of open court, including … open court files, renders the confidentiality rule limited to the pre-trial process." (Para. 80.)

[18]   In *Litton v. Braithwaite* 2006 BCSC 1481, 61 B.C.L.R. (4th) 146, decided in October 2006, Halfyard J. expressed the view that this court's statement of the law at para. 80 of *Doucette* had changed the law as held in *Discovery* and that accordingly, the implied undertaking of confidentiality did not apply to documents introduced at trial. (At para. 34.)

[19]   Finally in this review of the law leading up to December 2006, in *Xu v. Foo* 2006 BCCA 525, 62 B.C.L.R. (4th) 132, Huddart J.A. expressed uncertainty on the point in *obiter* at para. 58 of her reasons dated November 23, 2006.

[20]   <u>Subsequent to</u> the commencement of trial in the case at bar, any uncertainty as to whether the undertaking of confidentiality disappears once documents are adduced into evidence was largely dissipated by the Supreme Court of Canada's judgment on the appeal in *Doucette*, reported as *Juman v. Doucette, supra*.  The Supreme Court allowed the childcare worker's appeal from this court's order, concluding that it would be wrong for the police to be able to take advantage of statutorily-compelled testimony in civil litigation, thus undermining her right to silence and the protection against self-incrimination.  Although the Court said that a non-party engaged in other litigation would have standing to seek to obtain a modification of the implied undertaking, the Attorney General's application was rejected. The Court characterized his application as intended to "sidestep the appellant's silence in the face of police investigation of her conduct. The authorities should not be able to obtain indirectly a transcript which they are unable to obtain directly through a search warrant in the ordinary way because they lack the grounds to justify it."  (Para. 58.)

[21]   More importantly for purposes of this case, the Court in its discussion of the implied undertaking stated at para. 25 that the "general idea, metaphorically speaking" is that "whatever is disclosed in the discovery room stays in the discovery room unless eventually revealed in the courtroom or disclosed by judicial order." Further, the Court wrote at para. 51 that "When an <u>adverse party</u> incorporates the answers or documents obtained on discovery as part of the court record at trial, the undertaking is spent ..." (my emphasis), citing *Lac d'Amiante, supra,* and *Shaw Estate v. Oldroyd* 2007 BCSC 866 at paras. 20-2.  The Court continued:

> It follows that decisions to the contrary, such as the decision of the House of Lords in *Home Office v. Harman* ... should not be followed in this country.  The effect of the *Harman* decision has been reversed by a rule of change in its country of origin.  [At para. 51.]

In *Doucette* itself, since the civil action had settled in 2006, the undertaking was said to continue to bind the respondent, thus preserving the appellant's privacy interest indefinitely.

### The Chambers Judge's Decision

[22]   As I have said, counsel and the court below focussed on the state of the law as at the first day of trial for purposes of this case – even though it is generally the case that "judges do not create the law but merely discover it" (see *Canada (Attorney General) v. Hislop*, 2007 SCC 10, [2007] 1 S.C.R. 429, at paras. 83-8). The Union argued that *Discovery* remained good law at that time, and that it applied even to documents that had been entered as exhibits at trial. The chambers judge found that the law had only recently been changed by the Supreme Court of Canada in *Doucette* in 2008, and that prior to that decision, the law on this

point had been uncertain ? as illustrated by the reference in *Xu v. Foo* to "potential for a change in the law". (The chambers judge noted that the Court of Appeal in that case had apparently not been referred to its decision in *Doucette*, *supra*.) Further, he wrote, although it is now clear that a litigant's obligation of confidentiality comes to an end at the time a document is entered into evidence at trial, a rule to the contrary "had not been established" by December 2006. Thus the Union's position that the law at that time was as stated in *Discovery, supra,* could not be sustained. (Para. 28; my emphasis.)

[23]   The chambers judge then considered whether to exercise the Court's discretion to prohibit further disclosure in light of the fact that the Union had disclosed the Documents in discovery on the understanding that the undertaking of confidentiality would survive the trial. (Para. 29.) He suggested that if the issue had been fully raised and argued before the trial judge when the Documents were being tendered into evidence, the trial judge would have ruled that the implied undertaking of confidentiality would be extinguished in the absence of a sealing  order or agreement of the parties to the contrary. On the other hand, the chambers judge said, a sealing order might well have been granted by the trial judge had it been sought. (Para. 31.) The Court also noted that nothing in the parties' correspondence or in the Court of Appeal's memorandum (see para. 2 above) had suggested in any way that the deemed undertaking would cease to apply to discovery material introduced in evidence at trial. The chambers judge inferred that counsel for the Union had "probably believed" the obligation would continue post-trial.

[24]   At para. 34, the chambers judge listed a series of circumstances he saw as relevant to whether the Court's  inherent jurisdiction should be exercised in favour of the Union's position ? the fact that the Documents were "of a confidential nature"; the fact that the purpose of the Union's market recovery program could be defeated or prejudiced by publication; the fact that the Documents could not have been obtained other than by the discovery process; the lack of any compelling public interest that would be served by disclosure; the fact there was no evidence indicating that any outside parties had searched the registry or attempted to make disclosure of the Documents; and the fact that they had been returned by the court registry to the Union in early 2008. (Para. 34.) Considering all these factors, he concluded that the interests of justice would be best served if the undertaking were to "survive" the trial, even with respect to documents entered as exhibits. The defendants' application for a declaration that they were no longer bound by the undertaking was dismissed.

## ON APPEAL

[25]   On appeal, the defendants submit that the chambers judge erred in holding that the law with respect to the implied undertaking was uncertain at the time of trial; in holding that the Court retained jurisdiction to impose a "new" undertaking on the defendants after the undertaking had come to an end; and in imposing an undertaking in the circumstances of this case. The defendants say that at the time of commencement of trial in this case, the law was not uncertain, having been clearly stated in *Lac d'Amiante*, *Re Down*, *Doucette* and *Litton*. Those cases relied upon by the Union to illustrate uncertainty are, counsel says, distinguishable. In *Discovery,* the proceedings were interlocutory; in *Xu v. Foo*, the documents in question had never been tendered at trial, and in both cases the Court's comments regarding the termination of the obligation of confidentiality were entirely *obiter*.

[26]    Mr. McGrady for the defendants naturally relied on *Discovery* and the cases cited therein by Williams C.J.S.C. – *Wirth Ltd. v. Acadia Pipe and Supply Corp.* (1991) 79 Alta. L.R. (2d) 345 (Q.B.), where it was said that whether or not the undertaking ends when the information is read out in open court "has not been determined"; *Lubrizol Corp. v. Imperial Oil Ltd.* (1990) 39 F.T.R. 43 (Prothonotary), which relied heavily on *Harman*, *supra*; and *Sezerman v. Youle* (1996) 135 D.L.R. (4th) 226 (N.S.C.A.), where the Court was not prepared to "follow the rule-makers in England" who had overruled *Harman*.  As well, Mr. McGrady notes that I denied leave to appeal Chief Justice Williams' decision in *Discovery*: see [1998] B.C.J. No. 183, 103 B.C.A.C. 261.

[27]    All of these cases, of course, pre-dated *Lac d'Amiante*, *Re Down* and *Doucette* (C.A.).  Had they been examined, they would have suggested that the weight of authority ? albeit mostly *obiter dicta* ? by late 2006 supported the proposition that the deemed undertaking "evaporated" once the documents or transcripts were adduced into evidence at trial.  Although an argument might have been made to the effect that *Lac d'Amiante* was restricted to the province of Quebec and that this court in *Doucette* did not refer to *Lac d'Amiante* in any event, the better view would have been that this court correctly stated the law in *Doucette,* and was followed in *Litton*.  At the very least, the law was such that a party relying on the continuation of the implied undertaking after trial would have been alerted to the advisability of seeking a sealing order when the documents were tendered into evidence.  All of this, of course, is in addition to the usual rule, referred to earlier, that courts do not change the law but declare it.  The conclusion therefore seems inescapable that at all material times in this proceeding, the deemed undertaking was one that would likely terminate upon the entry of the Documents as exhibits in the trial record.

[28]    But there is more a fundamental reason why the deemed undertaking cannot in my view now be relied on by the Union – the fact that it was not the 'adverse party', but the Union itself, who introduced the Documents into evidence as part of its own case at trial.  None of the authorities to which we were referred supports the continuation of the undertaking, binding on the party <u>against</u> whom the documents were used (here, the defendants), in such circumstances. The policy rationales that found the obligation – the prevention of surprise at trial, the encouragement of settlements, the desirability of narrowing issues prior to trial and generally the public interest in "complete and candid" disclosure – become irrelevant once the party asserting confidentiality elects to enter the Documents as exhibits in an open courtroom, even if he or she did also disclose them in discovery.  Using the facts in *Harman* as an illustration, suppose that no discovery of documents had taken place but the Home Office had itself put the records into evidence.  There would be no issue of continued confidentiality – the Documents would have become public by the act of the party who previously asserted a privacy interest in them.  Similarly here, the Union elected to make the Documents public and cannot be said to be prejudiced if the defendants, like any other member of the public, use them for other purposes.  The fact the Union disclosed the Documents prior to trial does not, in my respectful view, alter this fact. What happened in the discovery room is superseded by what the Union did in the courtroom.

[29]    In the result, I consider that the chambers judge exercised his discretion on the basis of a misapprehension of principle – that the defendants in this case continued to be bound by the deemed undertaking in respect of Documents adduced into evidence by the Union itself the party claiming a privacy

interest.  Furthermore, even if the <u>defendants</u> had entered the Documents into evidence, the obligation would have terminated at that time in accordance with the law reviewed above.

[30]    In the result, I would allow the appeal and grant a declaration in the terms sought by the defendants in the notice of motion dated December 14, 2007.

"The Honourable Madam Justice Newbury"

I Agree:

"The Honourable Mr.  Justice Low"

I Agree:

"The Honourable Mr. Justice K. Smith"