EXHIBIT "B"



**Daniel R. Warner, Esq.**

August 3, 2012

Mr. Joel Hill
HAKEMI & COMPANY LAW CORPORATION
885 West Georgia Street, Suite 1500
Vancouver, BC, Canada
 V6C 3E8

SENT VIA EMAIL (jhill@hakemi.com) AND REGULAR MAIL

Re:    Supreme Court File VLC-S-S-123944;
       CURIS RESOURCES LTD v. J. DOE aka "ERIN'G'"

Mr. Hill:

   Please be advised that we represent J. Doe aka "erinG" in trying to resolve the above-referenced matter. We have been informed that your client is attempting to obtain a U.S. Court Order requiring the internet service provider to disclose my client's identity.  As explained below, continued pursuit in this regard would be a pointless endeavor given our laws in the United States governing free speech and personal jurisdiction.

   A United States Court may not enforce a foreign order that violates the protections of the United States Constitution by chilling protected speech that occurs simultaneously within our borders. *See, e.g., Matusevitch v. Telnikoff,* 877 F.Supp. 1, 4 (D.D.C.1995) (declining to enforce British libel judgment because British libel standards "deprive the plaintiff of his constitutional rights"); *Bachchan v. India Abroad Publications, Inc.,* 154 Misc.2d 228, 585 N.Y.S.2d 661 (Sup.Ct.1992) (declining to enforce a British libel judgment because of its "chilling effect" on the First Amendment); *see also, Abdullah v. Sheridan Square Press, Inc.,* No. 93 Civ. 2515, 1994 WL 419847 (S.D.N.Y. May 4, 1994) (dismissing a libel claim brought under English law because "establishment of a claim for libel under the British law of defamation would be antithetical to the First Amendment protection accorded to the defendants."). The reason for limiting comity in this area is sound. "The protection to free speech and the press embodied in [the First] amendment would be seriously jeopardized by the entry of foreign [ ] judgments granted pursuant to standards deemed appropriate in [another country] but considered antithetical to the protections afforded the press by the U.S. Constitution." *Bachchan,* 585 N.Y.S.2d at 665. Absent a body of law that establishes international standards with respect to speech on the Internet and an appropriate treaty or legislation addressing enforcement of such standards to speech originating within the United States, the principle of comity is outweighed by the Court's obligation to uphold the First Amendment.

   It is well-established that the First Amendment protects the right to speak anonymously. *Melvin v. Doe*, 575 Pa. 264, 836 A.2d 42 (2003); *Watchtower Bible & Tract Soc'y of New York v.*

*Village of Stratton*, 536 U.S. 150, 166-67 (2002); *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 199-200 (1999); *McIntyre v. Ohio Elections Comm'n* 514 U.S. 334 (1995). These cases have celebrated the important role played by anonymous or pseudonymous writings over the course of history, from the literary efforts of Shakespeare and Mark Twain to the authors of the Federalist Papers. As the United States Supreme Court said in *McIntyre*:

> [A]n author is generally free to decide whether or not to disclose his or her true identity. The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be, . . . the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry. Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.* * *
> Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent.

514 U.S. at 341-42, 356.

These rights are fully applicable to speech on the Internet. The Supreme Court has treated the Internet as a forum of preeminent importance because it places in the hands of any individual who wants to express his views the opportunity to reach other members of the public who are hundreds or even thousands of miles away. Accordingly, First Amendment rights fully apply to communications over the Internet. *Reno v. ACLU*, 521 U.S. 844 (1997).

A court order, even if granted for a private party, is state action and hence subject to constitutional limitations. *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); *Shelley v. Kraemer*, 334 U.S. 1 (1948). A court order to compel identification in a situation that threatens the exercise of fundamental rights "is subject to the closest scrutiny." *NAACP v. Alabama*, 357 U.S. 449, 461 (1958); *see Bates v City of Little Rock*, 361 U.S. 516, 524 (1960).

"[I]n order to compel discovery of an anonymous internet speaker's identity, the requesting party must show: (1) the speaker has been given adequate notice and a reasonable opportunity to respond to the discovery request, (2) the requesting party's cause of action could survive a motion for summary judgment on elements not dependent on the speaker's identity, and (3) a balance of the parties' competing interests favors disclosure." *Mobilisa, Inc. v. Doe*, 217 Ariz. 103, 112, 170 P.3d 712, 721 (Ct. App. 2007).

Accordingly, given the above, it is evident any continued effort to obtain my client's identity would be pointless. In order to sustain a cause of action for "injurious falsehood," a plaintiff must show that the defendant made a statement or statements: (1) to a third party, i.e., "published"; (2) knowing that the statement or statements were false; (3) in an effort to persuade the third party from dealing with the plaintiff; and (4) that resulted in a pecuniary loss to the plaintiff. *See, e.g., W. Techs., Inc. v. Sverdrup & Parcel, Inc.*, 154 Ariz. 1, 4, 739 P.2d 1318, 1321 (App.1986) (citing W. Prosser and W. Keeton, The Law of Torts § 128, at 963 (5th ed.1984), and Restatement § 623A).

First, the statements made by our client were either true, substantially true, or constitute opinion and are not action. If an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation. *Fender v. Phoenix Newspapers*, 130 Ariz. 475,

480, 636 P.2d 1257, 1261 (Ariz.App. 1981). Comment f to § 581(A) Restatement (Second) of Torts, § 581(A) states in part, "It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance" (Restatement (Second) of Torts § 581(A).)

Additionally, "if the defendants' statements about the plaintiff's [businesses] are protected opinions, the cause of action for trade libel must fail." *Films of Distinction, Inc. v. Allegro Film Productions, Inc.*, 12 F. Supp. 2d 1068, 1082 (C.D. Cal. 1998).  A speaker's use of "loose, figurative" language indicates that the statements in question constitute opinion. In *Standing Comm. on Discipline of the United States Dist. Court v. Yagman*, 55 F.3d 1430 (9th Cir. 1995), the court held that an attorney could not be sanctioned for accusing a district judge of being "dishonest" because the other terms the attorney used to describe the judge -- "ignorant," "ill-tempered," "buffoon," "sub-standard human," and "right-wing fanatic" -- made it clear that the attorney intended only to signal his general contempt for the judge, rather than to accuse him of corruption. *Id*. at 1440; *see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284, 41 L. Ed. 2d 745, 94 S. Ct. 2770 (1974) (holding that the use of the word "traitor" could not be reasonably interpreted as a representation of fact because it was used "in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization"); *Cochran*, 58 F. Supp. 2d at 1124-25 (holding that a statement that suggested that defense attorney Johnnie Cochran lied and exhibited unethical conduct was not actionable as a matter of law because the statement appeared in an opinion column and the author used "loose, figurative, and hyperbolic" speech throughout the column); *Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261 (C.D. Cal. 2001) (holding that publicly-traded company that brought action for trade libel, libel per se, interference with contractual relations and prospective economic advantage against individuals who had made postings critical of company in Internet chat room failed to establish probability of success on claims because the postings constituted opinion).

Second, our client did not make any effort to persuade third parties to refrain from dealing with the Plaintiff, and there is no conceivable motive that our client could have had to take such action.  Third, it is inconceivable how our client's postings could be the direct and proximate cause of your client's alleged damages.

It should also be noted that the injunctive relief sought by your client is strictly prohibited. In addition to the First Amendment's heavy presumption against prior restraints, courts have long held that equity will not enjoin a libel. *See Nebraska Press Ass'n*, 427 U.S. at 559, 96 S.Ct. 2791; *American Malting Co. v. Keitel*, 209 F. 351, 354 (2d Cir.1913); *Kramer v. Thompson*, 947 F.2d 666, 677-78 (3d Cir.1991) (citing cases); *Community for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C.Cir.1987) ("The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.") (internal citation omitted).

Moreover, your client would be unable to show that there is an imminent threat of irreparable harm that would be cause if the injunction was not granted.  An injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). A plaintiff seeking an injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.  *Id*.

Furthermore, because the District of Columbia Court does not have personal jurisdiction over our client, a court in the United States would not risk violating our client's Constitutional rights simply to allow your client to obtain judgment that is incapable of being enforced and is useless. When seeking discovery, a plaintiff is required to make a "preliminary showing of jurisdiction" before she is entitled to discovery. See, e.g., Fielding, 415 F.3d at 429 (stating that a plaintiff's discovery request should be granted if the "plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts"); Cable Electronics, Inc. v. North America, No. 3:08-CV-0433-M, 2009 WL 2382561, at *2 (N.D. Tex. 2009), (citing Fielding). However, it is well within the district court's discretion to deny discovery requests where the plaintiff "offers only speculation" of jurisdiction; "fishing expeditions" into jurisdictional facts are strongly disfavored. See, e.g., Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 402 (4th Cir. 2003); Base Metal Trading, Ltd. v. OJSC 'Novokuznetsky Aluminum Factory,' 283 F.3d 208, 216 n. 3 (4th Cir. 2002) (holding that a court can deny a discovery request if "the plaintiff simply wants to conduct a fishing expedition in the hopes of discovering some basis of jurisdiction").

Personal jurisdiction allows a court to enter a binding judgment on a party. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-72, (1985). Absent customary foundations for personal jurisdiction, such as domicile, physical presence, etc., due process requires that the defendants in an action have purposeful minimum contacts with the forum state so that the state's exercise of personal jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington,* 326 U.S. 310, 316 (1945). Our client has never even been to Canada.

Additionally, United States courts reject the proposition that the owner of a website can be sued anyplace that the site can be seen:

> If we were to conclude as a general principle that a person's act of placing information on the Internet subjects that person to personal jurisdiction in each State in which the information is accessed, then the defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist. The person placing information on the Internet would be subject to personal jurisdiction in every State. . . . But if that broad interpretation of minimum contacts were adopted, State jurisdiction over persons would be universal, and notions of limited State sovereignty and personal jurisdiction would be eviscerated.

*ALS Scan v. Digital Serv. Consultants*, 293 F.3d 707, 712-13 (4th Cir. 2002).

Nevertheless, notwithstanding the foregoing, as well as our client's belief that no wrong was committed, our client is willing to settle this matter short of continued litigation in the interest of cost containment. Subject to the parties entering into a confidential settlement agreement and mutual release, our client is agreeable to the following terms and conditions:

1. Our client will issue a retraction of the alleged defamatory statements under the name "erinG" on the applicable forums;
2. Our client will not post any false or defamatory comments about your client on any internet forum or blog;
3. Our client will not post any comments about your client on stockhouse.com;
4. Our client's identity will remain anonymous to your client when and until your client dismisses the pending lawsuit with prejudice and your client enters into the mutually

agreed upon settlement and release, which would contain confidentiality provisions prohibiting the disclosure of my client's identity;

5. In the event our client posts any false or defamatory comments about your client or breaches the settlement agreement, our client will be liable to your client for $50,000 per occurrence and subject to an injunction; and

6. Your client will dismiss the pending lawsuit in Canada with prejudice and release our client from any and all liability arising out of or relating to the subject matter referenced in the complaint.

Within five days from the date of this letter, please advise if your client is agreeable these terms and conditions, and I will prepare a formal settlement agreement and mutual release accordingly. Additionally, please be advised that any attempt to seek monetary compensation by your client would be futile given that our client would simply file bankruptcy.

Sincerely,

Daniel R. Warner, Esq.